UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| | * | |
| CONSERVATION LAW FOUNDATION, INC., | * | |
| | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 24-cv-11886-ADB |
| | * | |
| TOWN OF BARNSTABLE, MASSACHUSETTS, | * | |
| | * | |
| | * | |
| Defendant. | * | |
| | * | |

<u>**MEMORANDUM AND ORDER**</u>

BURROUGHS, D.J.

Plaintiff Conservation Law Foundation ("CLF") initiated this action claiming that discharges flowing from the Barnstable Water Pollution Control Facility ("the Facility"),which the Defendant operates, violate the Clean Water Act ("CWA"), specifically the CWA's restrictions on point source pollution without a permit. [ECF No. 1 ("Compl.")]. Plaintiff previously filed a similar complaint, which was dismissed in 2022. <u>Conservation L. Found., Inc. v. Town of Barnstable (CLF I)</u>, 615 F. Supp. 3d 14, 28 (D. Mass. 2022). Currently pending before the Court is Defendant's motion to dismiss for failure to state a claim. <u>See</u> [ECF No. 6]. For the reasons set forth below, Defendant's motion is <u>**GRANTED**</u> in part and <u>**DENIED**</u> in part.

I.      BACKGROUND

"In considering a motion to dismiss, the court accepts all factual allegations in the complaint as true and draws all reasonable inferences in plaintiff's favor." <u>Doe ex rel. Doe v. Cavanaugh</u>, 437 F. Supp. 3d 111, 115–16 (D. Mass. 2020).

**A.    Relevant Facts**

Many of the facts remain unchanged from <u>CLF I</u>.  CLF is a "nonprofit, member-supported, regional organization dedicated to protecting New England's environment." [Compl. ¶ 23].  Barnstable is a municipality that owns and operates the Barnstable Water Pollution Control Facility in Hyannis, Massachusetts.  [<u>Id.</u> ¶ 35].  Barnstable currently operates the Facility under a Groundwater Discharge Permit issued by the Massachusetts Department of Environmental Protection ("MassDEP").  [<u>Id.</u> ¶ 133].  The Facility collects wastewater from a network of 55 miles of pipes and 27 pumping stations, with 1.67 million gallons of wastewater flowing through the Facility daily.  [<u>Id.</u> ¶¶ 123–24].  Once raw sewage has been treated and partially denitrified at the Facility, the wastewater, or effluent, is subsequently poured into the Facility's sand beds.  [<u>Id.</u> ¶¶ 126–28].  According to a 2008 report from the Massachusetts Estuaries Project, the median nitrogen concentration of effluent discharged by the Facility "ranges between approximately 4 to 8 mg/L, with an average total nitrogen concentration of 5.51 mg/L." [<u>Id.</u> ¶ 141].  The 2008 report estimated that the Facility discharges 12,947 kilograms of nitrogen through its effluent annually.  [<u>Id.</u> ¶ 143].

Plaintiff has, however, added to the current complaint several allegations of significance to the Court's analysis.[1]  First, it alleges that the groundwater in the specific area of Cape Cod

---

[1] At oral argument, Defendant suggested that some of these additional facts had already been raised in Plaintiff's Motion to Alter Judgment, <u>CLF I</u>, 615 F. Supp. 3d 14 (No. 21-cv-10258), and therefore had been previously considered by the Court.  [Motion to Dismiss Rough Tr. at 3:1–8].  Thus, by Defendant's logic, this is Plaintiff's third bite at the apple.  The Court notes that it specifically did not consider these additional facts, as they had not appeared in any filings, let alone the original complaint, at the time Plaintiff raised them in their motion.  Order Denying Motion to Alter Judgment, <u>CLF I</u>, 615 F. Supp. 3d 14 (No. 21-cv-10258).  The Court expressly gave Plaintiff leave to file a new complaint with these new allegations, <u>id.</u>, and therefore the Court presently considers these new allegations for the first time.

relevant to its claims travels at a rate of 2.5 feet per day, [Compl. ¶ 83], in contrast to the one

foot per day alleged in CLF I, 615 F. Supp. 3d at 18.[2]  Moreover, Plaintiff adds eight ponds that

it alleges are waters of the United States affected by the Facility's discharges, in addition to the

five bodies of water identified in its original complaint.  [Compl. ¶¶ 58–59].

      **B.    Procedural History**

      Plaintiff filed its first complaint against Defendant on February 16, 2021.  Complaint,

CLF I, 615 F. Supp. 3d 14 (No. 21-cv-10258).  This case was dismissed on July 20, 2022,  CLF

I, 615 F. Supp. 3d 14, and Plaintiff filed for reconsideration, Motion to Alter Judgment, CLF I,

615 F. Supp. 3d 14 (No. 21-cv-10258), which was denied, Order Denying Motion to Alter

Judgment, CLF I, 615 F. Supp. 3d 14 (No. 21-cv-10258).  Plaintiff subsequently filed the present

action on July 22, 2024.  See generally [Compl.].  Defendant moved to dismiss on September 23,

---

[2] The number relied upon in CLF I comes from the Lewis Bay System and Halls Creek Total
Maximum Daily Loads Report ("TMDL Report") prepared by MassDEP and approved by the
Environmental Protection Agency.  Defendant argues that, based on Plaintiff's inclusion of the
TMDL Report, the velocity of groundwater should be assumed to be one foot per day, as alleged
in CLF I, rather than the 2.5 feet per day alleged in Plaintiff's operative complaint. [Compl. ¶
83].  The TMDL Report states that "[i]n the sandy soils of Cape Cod, effluent that has entered
the groundwater travel towards the coastal waters at an average rate of one foot per day."  [ECF
No. 1-5 at 12].  The Court agrees with Plaintiff's position at oral argument that this number
refers to an average over all of Cape Cod, and does not preclude them from alleging that, in the
specific relevant areas, the groundwater may move more quickly.  [Motion to Dismiss Rough Tr.
at 21:11–18].  And indeed, Plaintiff does so allege and is supported by an expert.  See Stone v.
High Mountain Mining Co., 89 F.4th 1246, 1257–58 (10th Cir. 2024) (district court relied on
expert testimony for determining groundwater velocity in a National Pollution Discharge
Elimination System ("NPDES") case).  The Court recognizes that this is inconsistent with the
pleadings in CLF I, but as that case was dismissed without a determination on the merits, there is
no obstacle to Plaintiff amending their pleading here.  Cf. InterGen N.V. v. Grina, 344 F.3d 134,
145 (1st Cir. 2003) ("An amended complaint supersedes the original complaint, and facts that are
neither repeated nor otherwise incorporated into the amended complaint no longer bind the
pleader.").

2024.  [ECF No. 6].  Plaintiff opposed on October 23, 2024, [ECF No. 14], and Defendant

entered its reply on November 6, 2024, [ECF No. 15].

## II.    DISCUSSION

### A.    Legal Standard

On a motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil

Procedure Rule 12(b)(6), the Court must accept as true all well-pleaded facts, analyze them in

the light most favorable to the plaintiff, and draw all reasonable inferences from those facts in

favor of the plaintiff.  See U.S. ex rel. Hutcheson v. Blackstone Med., Inc., 647 F.3d 377, 383

(1st Cir. 2011).  "[A] complaint must provide 'a short and plain statement of the claim showing

that the pleader is entitled to relief,'" Cardigan Mountain Sch. v. N.H. Ins. Co., 787 F.3d 82, 84

(1st Cir. 2015) (quoting Fed. R. Civ. P. 8(a)(2)), and set forth "factual allegations, either direct or

inferential, respecting each material element necessary to sustain recovery under some actionable

legal theory," Pitta v. Medeiros, 90 F.4th 11, 17 (1st Cir. 2024) (quoting Gagliardi v. Sullivan,

513 F.3d 301, 305 (1st Cir. 2008)).  Although detailed factual allegations are not required, a

complaint must set forth "more than labels and conclusions," Bell Atl. Corp. v. Twombly, 550

U.S. 544, 555 (2007), and "[t]hreadbare recitals of the elements of a cause of action, supported

by mere conclusory statements, do not suffice," Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

Rather, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to

relief that is plausible on its face.'"  Id. (quoting Twombly, 550 U.S. at 570).

"To cross the plausibility threshold a claim does not need to be probable, but it must give

rise to more than a mere possibility of liability."  Grajales v. P.R. Ports Auth., 682 F.3d 40, 44–

45 (1st Cir. 2012) (citing Iqbal, 556 U.S. at 678).  "A determination of plausibility is 'a context-

specific task that requires the reviewing court to draw on its judicial experience and common

sense.'" Id. at 44 (quoting Iqbal, 556 U.S. at 679). "[T]he complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible." Hernandez-Cuevas v. Taylor, 723 F.3d 91, 103 (1st Cir. 2013) (quoting Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 14 (1st Cir. 2011)). "The plausibility standard invites a two-step pavane." A.G. ex rel. Maddox v. Elsevier, Inc., 732 F.3d 77, 80 (1st Cir. 2013) (citing Grajales, 682 F.3d at 45). First, the Court "must separate the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited)." Id. (quoting Morales-Cruz v. Univ. of P.R., 676 F.3d 220, 224 (1st Cir. 2012)). Second, the Court "must determine whether the remaining factual content allows a 'reasonable inference that the defendant is liable for the misconduct alleged.'" Id. (quoting Morales-Cruz, 676 F.3d at 224).

Additionally, "a court may not look beyond the facts alleged in the complaint, documents incorporated by reference therein and facts susceptible to judicial notice." MIT Fed. Credit Union v. Cordisco, 470 F. Supp. 3d 81, 84 (D. Mass. 2020) (citing Haley v. City of Boston, 657 F.3d 39, 46 (1st Cir. 2011)). When reviewing a motion to dismiss, the Court may consider documents outside of the pleadings, "'the authenticity of which are not disputed by the parties,' making narrow exceptions to the general rule 'for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint.'" Álvarez-Maurás v. Banco Popular of P.R., 919 F.3d 617, 622–23 (1st Cir. 2019) (quoting Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993)).

## B. Analysis

### 1. Statutory Background of the Federal Clean Water Act

"[T]he CWA prohibits 'the discharge of any pollutant by any person' from a 'point source' to the waters of the United States without [a National Pollution Discharge Elimination

System ("NPDES")] permit from the EPA."  <u>CLF I</u>, 615 F. Supp. 3d at 20 (quoting 33 U.S.C. §§
1311(a), 1362(12)(A)).  The CWA does not, however, ordinarily extend federal authority over
discharges into groundwater, <u>see</u> <u>Cnty. of Maui v. Haw. Wildlife Fund</u>, 590 U.S. 165, 174–75
(2020), and the parties do not dispute that the Facility discharges into groundwater, rather than
directly into a navigable water, <u>see</u> [Compl. ¶ 94].  Moreover, Defendant does not argue that the
facility does not discharge pollutants.[3]  It is also not in dispute that the Facility is a point source.
<u>See</u> [<u>id.</u> ¶ 260].  At issue in this case, then, is whether Defendant "has discharged pollutants and
is currently discharging pollutants . . . in a manner functionally equivalent to a direct discharge"
into a navigable water without a NPDES permit in violation of the CWA.  [<u>Id.</u> ¶¶ 261–62].

i.    <u>Direct Discharge</u>

The Court discussed at length the history of the CWA and the Supreme Court's decisions
regarding what constitutes a "<u>direct discharge</u> [of a pollutant] from [a] point source into
navigable waters" in <u>CLF I</u>, especially where, as here, the initial discharge is actually into
groundwater.  615 F. Supp. 3d at 20–23 (emphasis added) (quoting <u>Maui</u>, 590 U.S. at 170).  In
summary, in making a determination as to whether a discharge into groundwater is the
"functional equivalent" of a direct discharge and therefore subject to regulation under the CWA,
the Court must evaluate:

> (1) transit time, (2) distance traveled, (3) the nature of the material through
> which the pollutant travels, (4) the extent to which the pollutant is diluted or
> chemically changed as it travels, (5) the amount of pollutant entering the
> navigable waters relative to the amount of the pollutant that leaves the point
> source, (6) the manner by or area in which the pollutant enters the navigable

---

[3] The term "pollutant" includes "sewage," "sewage sludge," "biological materials," "chemical
wastes," and "industrial, municipal, and agricultural waste discharged into water."  33 U.S.C. §
1362(6).

waters, (7) the degree to which the pollution (at that point) has maintained its
specific identity.

Id. at 22 (quoting Maui, 590 U.S. at 184–85).  Although none of these factors listed is

dispositive, time and distance are considered the most important.  See id.  The Supreme Court

has provided some limited guidance on these factors, stating that groundwater traveling for 100

years and 50 miles is plainly not the equivalent of a direct discharge, but has not established

more specific limits.  See id. at 24–25.  In subsequent years, the issue has been addressed by a

few courts.[4]

ii.    Navigable Waters

Plaintiff's new complaint introduces a second issue that arises in relation to NPDES cases

that was not at issue in CLF I, namely the concept of navigable waters.  The CWA regulates the

discharge of pollutants only into "navigable waters."  33 U.S.C. §§ 1311, 1344.  The statute

defines "navigable waters" as "waters of the United States, including the territorial seas."  33

U.S.C. § 1362(7).  By regulation, as of 2023, "[w]aters of the United States" are defined as:

(1) Waters which are:

(i) Currently used, or were used in the past, or may be susceptible to use
in interstate or foreign commerce, including all waters which are subject
to the ebb and flow of the tide;

(ii) The territorial seas; or

---

[4] These cases include the remand of Hawaii Wildlife Fund v. County of Maui, 550 F. Supp. 3d
871, 886–87 (D. Haw. 2021) (summary judgment for plaintiff finding that 84 days was the
functional equivalent of a direct discharge); Black Warrior River-Keeper, Inc. v. Drummond Co.,
579 F.Supp.3d 1310, 1316–17 (N.D. Ala. 2022) (granted summary judgment to plaintiff who
filed CWA claim against mining company that discharged pollutants that traveled via
groundwater for approximately 1.5 to 14.6 days before reaching navigable waters); and Stone, 89
F.4th at 1259 (agreeing with the district court that two days and a distance 70 feet could
constitute a functional equivalent but remanding because district court failed to analyze the
other Maui factors).

(iii) Interstate waters, including interstate wetlands;

(2) Impoundments of waters otherwise defined as waters of the United States under this definition, other than impoundments of waters identified under paragraph (a)(5) of this section;

(3) Tributaries of waters identified in paragraph (a)(1) or (2) of this section:

(i) That are relatively permanent, standing or continuously flowing bodies of water; or

(ii) That either alone or in combination with similarly situated waters in the region, significantly affect the chemical, physical, or biological integrity of waters identified in paragraph (a)(1) of this section;

(4) Wetlands adjacent to the following waters:

(i) Waters identified in paragraph (a)(1) of this section; or

(ii) Relatively permanent, standing or continuously flowing bodies of water identified in paragraph (a)(2) or (a)(3)(i) of this section and with a continuous surface connection to those waters; or

(iii) Waters identified in paragraph (a)(2) or (3) of this section when the wetlands either alone or in combination with similarly situated waters in the region, significantly affect the chemical, physical, or biological integrity of waters identified in paragraph (a)(1) of this section;

(5) Intrastate lakes and ponds, streams, or wetlands not identified in paragraphs (a)(1) through (4) of this section:

(i) That are relatively permanent, standing or continuously flowing bodies of water with a continuous surface connection to the waters identified in paragraph (a)(1) or (a)(3)(i) of this section; or

(ii) That either alone or in combination with similarly situated waters in the region, significantly affect the chemical, physical, or biological integrity of waters identified in paragraph (a)(1) of this section.

40 CFR § 120.2 ("the 2023 WOTUS Rule").

The Supreme Court has delved into the murky depths of the definition of "waters of the United States" on several occasions. First, in 1985, in United States v. Riverside Bayview Homes, Inc., 474 U.S. 121 (1985), the Court held that the Army Corps of Engineers could exercise CWA jurisdiction over wetlands and non-navigable waters that are "adjacent" to navigable waters. Id. at 135. Later, the Court in Solid Waste Agency of Northern Cook County

v. Army Corps of Engineers (SWANCC), 531 U.S. 159 (2001), limited the so-called "Migratory Bird Rule" by holding that waters and wetlands that are not adjacent to traditional navigable waters are not waters of the United States covered by the CWA.  Then, in Rapanos v. United States, 547 U.S. 715 (2006), a plurality of the Court held that

> [T]he phrase "the waters of the United States" includes only those relatively permanent, standing or continuously flowing bodies of water "forming geographic features" that are described in ordinary parlance as "streams, oceans, rivers, and lakes." . . .  The phrase does not include channels through which water flows intermittently or ephemerally, or channels that periodically provide drainage for rainfall."

Id. at 739 (cleaned up and citations omitted).  Most recently, in Sackett v. EPA, 598 U.S. 651 (2023), the Court held by a majority that the Rapanos plurality was correct,[5] specifically that "waters of the United States" only includes non-navigable waters that are "indistinguishable from waters of the United States."  Sackett, 598 U.S. at 678 (quoting Rapanos, 547 U.S. at 755). This occurs only when those non-navigable waters have "a continuous surface connection to bodies that are 'waters of the United States' in their own right, so that there is no clear demarcation between [navigable waters] and [non-navigable waters]."  Id. (cleaned up) (quoting Rapanos, 547 U.S. at 742).

It is against this backdrop that we turn to the arguments raised by the parties.

---

[5] Until the Sackett decision, the controlling opinion in Rapanos was often thought to be Justice Kennedy's concurrence, as the "narrowest" majority vote.  See United States v. Johnson, 467 F.3d 56, 59–66 (1st Cir. 2006).  Justice Kennedy's fact-intensive balancing test turned on whether the non-navigable water had a "'significant nexus' to waters that are or were 'navigable or that could reasonably be so made.'"  Rapanos, 547 U.S. at 759 (Kennedy, J., concurring). After Sackett, this approach has been abandoned.  Sackett, 598 U.S. at 681.

## 2.     Identified Waters of the United States

Although there is not an ocean between the complaint at issue in <u>CLF I</u> and the present complaint, here Plaintiff alleges for the first time that, in light of the 2023 WOTUS Rule, the operative navigable waters to which there is an alleged direct discharge include not only Lewis Bay, Hyannis Inner Harbor, Halls Creek, Snow's Creek, and Stewart's Creek (collectively, "the <u>CLF I</u> waters"), but also Duck Pond, Dunns Pond, Fawcetts Pond, Aunt Bettys Pond, Simmons Pond, Schools Pond, and two unnamed ponds (collectively, "the Ponds"). <u>See</u> [Compl. ¶¶ 58–59, 68]. As there was no dispute as to whether the first five were waters of the United States in <u>CLF I</u>, and the parties do not so dispute here, the Court focuses its analysis on the Ponds.

### i.     <u>Independent Navigable Waters</u>

Plaintiff argues that half of the newly identified bodies of water—Duck Pond, Dunns Pond, Schoolhouse Pond, and Unnamed Pond A (collectively, "the Independent Ponds")—are prima facie covered by the regulation defining "waters of the United States" because they are "used in, or may be susceptible to use in, interstate or foreign commerce." [Compl. ¶ 59]. Plaintiff alleges that saleable parcels of land include parts of the Independent Ponds, and many property sales in Cape Cod are interstate transactions. <u>See</u> [<u>id.</u> ¶¶ 59–62]. Plaintiff further argues that the Independent Ponds draw out-of-state tourists. <u>See</u> [<u>id.</u>] Defendant argues that this definition of "susceptible to use in interstate commerce" is too broad and would wash away the distinction between navigable and non-navigable waters. [ECF No. 7 at 9–10].

The Court agrees with Defendant. <u>SWANCC</u> makes clear that this definition would run afoul of the Supreme Court's interpretation of the CWA. <u>See</u> 531 U.S. at 171–72. In <u>SWANCC</u>, the Army Corps of Engineers argued that intrastate, "isolated ponds" could be properly regulated as waters of the United States under the CWA because they served as habitats for migratory

birds, which themselves were part of interstate commerce.  Id.  The Supreme Court disagreed, holding that while the term "'navigable' in the statute was of 'limited import,'" it did not have "no effect whatsoever," and therefore the CWA's "traditional jurisdiction [was] over waters that were or had been navigable in fact or which could reasonably be so made."  Id.  The Court sees no difference here.  Although Plaintiff alleges it is migratory people, rather than birds, who may make these ponds part of their habitats, this is insufficient to render the Independent Ponds "waters of the United States" under the Supreme Court's precedent.

The Court therefore GRANTS Defendant's motion to dismiss as to Counts I, II, III, and VIII each of which relies on the Independent Ponds being waters of the United States.

ii.    Waters with a Continuous Surface Connection

For the remaining new ponds—Fawcetts Pond, Aunt Bettys Pond, Simmons Pond, and Unnamed Pond B (collectively, "the Surface Connected Ponds")—Plaintiff makes a different argument.  It argues that the Surface Connected Ponds have a "continuous surface connection[] to [other waters of the United States]," meaning that they would therefore be protected under 40 C.F.R. § 120.2(a)(5).  [Compl. ¶ 58].  Defendant argues that the Surface Connected Ponds lack a continuous surface connection.  See [ECF No. 7 at 15–18].

At first blush, this would seem to be the kind of factual determination that is prohibited at the motion to dismiss stage.  Roeder v. Alpha Indus., Inc., 814 F.2d 22, 25 (1st Cir. 1987) ("In ruling on a motion to dismiss, . . . a court should not decide questions of fact.").  Defendant would have the Court conclude otherwise by taking judicial notice of pictures from Google "Street View," see [ECF No. 7 at 11; ECF Nos. 7-3, 7-4, 7-5], although it is not clear that this Court has the authority to do so.  See Jorge v. Vimeo, 718 F. Supp. 3d 95, 99 (D. Mass. 2024) ("In ruling on a motion to dismiss, courts generally are limited to considering 'the complaint,

documents attached to it, and documents expressly incorporated into it.'" (quoting <u>Foley v. Wells Fargo Bank, N.A.</u>, 772 F.3d 63, 72 (1st Cir. 2014))), <u>aff'd sub nom.</u> <u>Jorge v. Vimeo.com, Inc.</u>, No. 24-1252, 2025 WL 884094 (1st Cir. Feb. 25, 2025).  But even if the Court were to consider these images, it would be unable to conclude that, as a matter of law, the waters at issue do not share a continuous surface connection with the conceded waters of the United States.  The maps and photographs provided are insufficient for the Court to make such an evaluation.  Although the Court can see that there are roads in the map that intersect the alleged continuous streams, as Plaintiff notes, the Court cannot see from a few aerial photographs what infrastructure exists that could definitively form or sever a continuous surface connection.  <u>See</u> [ECF No. 14 at 19–20 (citing <u>Deerfield Plantation Phase II-B Prop. Owners Ass'n v. U.S. Army Corps of Eng'rs</u>, 801 F. Supp. 2d 446, 455, 465 (D.S.C. 2011), <u>aff'd</u>, 501 F. App'x 268 (4th Cir. 2012); <u>United States v. Donovan</u>, 661 F.3d 174, 185–86 (2d Cir. 2011); <u>Dague v. City of Burlington</u>, 935 F.2d 1343, 1355 (2d Cir. 1991), rev'd in part on other grounds, 505 U.S. 557 (1992)].  For example, the streams may run under the road, which would not be visible from an aerial photograph.

The cases on which Defendant relies to show otherwise, [ECF No. 14 at 12], are distinguishable.  <u>Lewis v. United States</u>, 88 F.4th 1073 (5th Cir. 2023), involved a dispute between a landowner and the Army Corps of Engineers, and therefore had an agency record which is not the case here.  And while <u>Glynn Environmental Coalition, Inc. v. Sea Island Acquisition, LLC</u>, No. 219-cv-00050, 2024 WL 1088585 (S.D. Ga. Mar. 1, 2024), did concern a motion to dismiss, the decision turned on the <u>allegations</u>, rather than any factual determinations made by the court.  In that case the plaintiff alleged that the wetland connected to the relevant water of the United States via "surface runoff and groundwater," which plainly cannot form a continuous surface connection.  <u>Id.</u> at *5.  That is distinguishable from the case at hand where

12

Plaintiff clearly alleges a continuous surface connection.  It may well be true that this allegation can be disposed of easily at summary judgment, but the Court declines to do so at this early stage.

### 3.    Direct Discharge from a Point Source

Having identified the bodies of water for which the properly pleaded allegations could support a finding that these are waters of the United States—the CLF I waters and the Surface Connected Ponds—the Court next turns to whether the discharge from the Facility constitutes a "direct discharge [of a pollutant] from [a] point source into navigable waters" under the Supreme Court's precedent in Maui.  590 U.S. at 186.  We analyze the bodies of water in turn.

#### i.    CLF I Waters

This Court "reluctantly" granted Defendant's motion to dismiss in CLF I.  615 F. Supp. 3d at 28.  It must now evaluate whether Plaintiff's expanded allegations have changed the balancing of the Maui factors enough to alter this Court's decision.

In CLF I, Plaintiff alleged that "[t]he Facility's sand beds are located approximately 1.5 miles from surface waters within the Lewis Bay Watershed System, including Stewarts Creek and Hyannis Inner Harbor."  Complaint, CLF I, 615 F. Supp. 3d 14, ¶ 94 (No. 21-cv-10258).  It was on this basis that the Court calculated, based on an alleged one foot per day transit time, that it would take over 21 years for the effluent to reach a navigable water.  See CLF I, 615 F. Supp. 3d at 24.  This was the focus of the Court's decision granting the motion to dismiss.  Id. ("Because the approximate travel time is 21 years, the Facility's effluent release does not constitute the 'functional equivalent' of a direct discharge for the purposes of requiring an NPDES permit.").

In the present complaint, by contrast, Plaintiff not only alleges that the groundwater in this region flows at a faster rate, see [Compl. ¶ 83], but it also alleges more specific distances for the bodies of water at issue, many of which are less than 1.5 miles: .76 miles (Stewart's Creek), 1.11 miles (Halls Creek), 1.4 miles (Snow's Creek), 1.45 miles (Hyannis Inner Harbor), and 1.6 miles (Lewis Bay), [id. ¶¶ 216, 221, 226, 229, 233].  Given the 2.5 feet per day velocity cited by Plaintiff, [id. ¶ 83], it would take groundwater approximately 4.4 years, 6.4 years, 8.1 years, 8.4 years, and 9.3 years respectively to reach a navigable water.  It is not clear to the Court, particularly on the shorter end of that spectrum, that the time factor weighs the same way it did in CLF I as all of these timeframes would be less than a decade, compared to the multiple decades at issue there.  See Haw. Wildlife Fund. v. Cnty. of Maui, 550 F. Supp. 3d 871, 886 (D. Haw. 2021) ("Because the Supreme Court knew it was dealing with movement through groundwater, it makes sense to assume that the Court expected the parties to be dealing with transport time measured in months.  Notably, the Supreme Court set its extreme at 'many years,' not at 'many months,' and not even at one year or two years.").  Moreover, the distance factor, which this Court in CLF I held weighed less strongly in favor of Defendant, 615 F. Supp. 3d at 25, arguably weighs in favor of Plaintiff here.  Considering Stewart's Creek as an example, the distance is alleged to be less than one mile and approximately half of the distance alleged in CLF I.  Moreover, when weighing distance in favor of Defendant in CLF I, the Court relied on the "direct correlation between transit time and distance" in holding that a distance over 1.5 miles would favor Defendant.  Id. at 25.  Where transit time less clearly favors Defendant, its impact on the Court's consideration of the related distance factor is less pronounced.

Because time and distance present a much closer call on these allegations, the Court turns to the remaining Maui factors.  Plaintiff argues that the amount of pollutant entering the

navigable waters, specific identity of the pollutant, chemical change of the pollutant, manner of entry of the pollutant, and nature of material through which the pollutant travels all point in its favor.  [Compl. ¶ 47].  The allegations supporting this argument in the complaint are that the annual nitrogen load attributable to the Facility is 12,000 kilograms per year, [id. ¶ 264]; "nitrogen is not held by soil particles, and is readily leached as water flows through the soil," [id. ¶ 87 (cleaned up)]; "all of the nitrogen in the Facility's sewage reaches [the relevant] surface waters without any chemical changes," [id. ¶ 95]; and the material that the discharge moves through is "porous, sandy soil," [Compl. ¶ 77]. Defendant counters that these factors weigh in favor of dismissal because (1) Plaintiff's incorporated documents show that at least half of the nitrogen is attenuated when the groundwater surfaces, [ECF No. 7 at 21–22]; (2) the flow of groundwater is "unlike water flowing through a pipe," [id. at 21]; and (3) the "multi-modal" journey of the water is too indirect to be a direct discharge, [id. at 20].

Weighing the additional Maui factors does not clearly favor dismissal at this early stage. Defendant's arguments on the manner of entry and the nature of the material do little more than reiterate its distance arguments, stating that the "journey" here is not equivalent to "effluent traveling through a 'pipe' set back 'only a few yards' from a navigable water."  [ECF No. 7 at 20 (quoting Maui, 590 U.S. at 178)].  Moreover, although it may be the case that the nitrogen gets "attenuated" in surface waters, such as ponds, Plaintiff's allegations make clear that significant quantities of nitrogen reach these waters.  See [Compl. ¶ 264].  Taken together, the Court does not find that these factors so clearly favor Defendant as to outweigh the updated distance and time considerations Plaintiff is alleging in the complaint at issue.

Recognizing that this is a close call, and that Plaintiff will likely have an uphill battle at summary judgment, the Court **DENIES** the motion to dismiss as to Counts IX–XIII.

ii.    Surface Connected Ponds

Although the Surface Connected Ponds are all slightly differently situated, the analysis for these ponds is largely similar to the CLF 1 waters, as are the parties' arguments. The distances alleged are .76 miles (Fawcetts Pond), .95 miles (Aunty Bettys Pond), 1.11 miles (Unnamed Pond B), and 1.44 miles (Simmons Pond). [Compl. ¶¶ 195, 199, 203, 207]. This equates to 4.4 years, 5.5 years, 6.4 years, and 8.4 years respectively for time for the groundwater to reach these bodies of water—which are largely comparable to the times and distances discussed above for the CLF I waters.

And indeed, some of the additional Maui factors weigh even more strongly in Plaintiff's favor for the Surface Connected Ponds. For example, even by Defendant's arguments, much of the nitrogen attenuation is alleged to occur in ponds. See [ECF No. 7 at 21]. Even if some of the attenuation occurs in the Isolated Ponds before the effluent reaches the Surface Connected Ponds, the attenuation is likely to be even less for the Surface Connected Ponds than for the CLF I ponds, meaning that more of the nitrogen reaches those ponds. The Maui factors, therefore, do not demand dismissal for the Surface Connected Ponds.

Defendant's motion to dismiss Count IV–VII is **DENIED**.

iii.    Balance of State and Government Regulation

The Court recognizes that this decision is a departure from the decision in CLF I, in which the balance of state and federal regulation was discussed at length in reaching the decision to dismiss the complaint. See CLF I, 615 F. Supp. at 26–27. Although these considerations remain important to the Court's decision, they are reflected in the balancing test provided by the Court in Maui, which seeks to protect both the interests of states in autonomy and regulating groundwater and the federal government in protecting waters of the United States from loopholes

16

that would compromise their integrity.  <u>See</u> 590 U.S. at 185.  If, in fact, at summary judgment or trial, it is clear that the Facility does not functionally directly discharge into any waters of the United States (for example, if it is the case that the groundwater actually does take 21 years to reach a navigable water), then the town of Barnstable will not be required to acquire a NPDES permit for the facility.  But on the allegations as pled, the Court cannot reach that conclusion.

## III.    CONCLUSION

Defendant's motion to dismiss is **<u>GRANTED</u>** as to Counts I, II, III, and VIII.

Defendant's motion to dismiss is **<u>DENIED</u>** as to Counts IV–VII and IX–XIII.

**SO ORDERED.**

June 5, 2025                                                    */s/ Allison D. Burroughs*
                                                                ALLISON D. BURROUGHS
                                                                U.S. DISTRICT JUDGE